

# NUMBER 13-10-00325-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

UNION CARBIDE CORPORATION
AND GST SETTLEMENT FACILITY,                    Appellants,

**v.**

OSCAR TORRES AND DORA TORRES,                    Appellees.

---

### On appeal from the 107th District Court
### of Cameron County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Benavides and Hinojosa
### Memorandum Opinion by Justice Hinojosa

Appellants GST Settlement Facility, successor-in-bankruptcy to Garlock Sealing Technologies LLC (Garlock), and Union Carbide Corporation (UCC) appeal from a judgment following a jury trial in favor of appellees Oscar and Dora Torres.[1]  The

---

[1] The final judgment in this case was signed on March 22, 2010, and appellants filed their

Torreses sued appellants, alleging that Oscar developed mesothelioma as a result of his exposure to asbestos while working at a UCC chemical plant and with gaskets manufactured by Garlock.

In three issues,[2] UCC argues that the evidence is legally insufficient to establish that: (1) UCC controlled the manner of Oscar's work; (2) UCC had actual knowledge that the Garlock gaskets were dangerous; and (3) Oscar's exposure to asbestos at UCC's plant was a substantial factor in causing his mesothelioma. In one issue, Garlock argues that the Torreses failed to present legally sufficient evidence that Oscar's exposure to its gaskets was a substantial factor in causing Oscar's mesothelioma. We affirm in part and reverse and render in part.

## I. BACKGROUND

In 2009, Oscar was diagnosed with mesothelioma, a cancer affecting the lining of the lungs that is caused almost exclusively by exposure to respirable asbestos fibers. Oscar initially sued nineteen defendants alleging causes of action for premises liability, products liability, negligence, and fraud. At the time of trial, two defendants remained: (1) UCC, a premises liability defendant; and (2) Garlock, a products liability defendant.[3]

_____

respective notices of appeal on June 3 and 8, 2010. We abated the appeal on June 17, 2010 due to bankruptcy proceedings concerning the defendant Garlock Sealing Technologies LLC. We reinstated the appeal on July 11, 2018 and granted appellant's motion to substitute GST Settlement Facility as successor in bankruptcy to Garlock Sealing Technologies LLC. The appeal was abated again on May 17, 2019 to allow the parties to attend mediation. The parties were unable to reach a settlement, and this Court reinstated the appeal on September 5, 2019.

[2] UCC identifies four issues in the "Issues Presented" portion of its brief, but the argument section of the brief is organized around three issues. Further, UCC purports to challenge both the legal and factual sufficiency of the evidence supporting various jury findings. However, the argument section of UCC's brief presents only no-evidence or legal sufficiency challenges to those findings. We frame our analysis around the issues as they are developed in the body of UCC's brief.

[3] The Torreses non-suited a third defendant during trial.

The record generally establishes that Oscar, while working as a pipefitter at UCC's Brownsville chemical plant, was exposed to pipe insulation containing amosite asbestos fibers and the Garlock 7705 gasket[4] containing crocidolite asbestos fibers.[5] Appellants did not dispute at trial that Oscar suffered from mesothelioma or that his condition was caused by asbestos exposure.

## A. Diagnosis

Oscar, who was 71 years old at the time of trial, began experiencing dizziness and shortness of breath in 2008. After various medical examinations and tests, Oscar was diagnosed with mesothelioma. Oscar was referred to William Roy Smythe, M.D., a thoracic surgeon focusing on the treatment of mesothelioma patients. Dr. Smythe testified that mesothelioma develops from the inhalation of asbestos fibers and the penetration of the fibers through the air sac of the lung. He explained that the body's inflammatory reaction to the fibers causes genetic damage. As the damage accumulates, a patient can develop mesothelioma.

After examining Oscar's occupational history, Dr. Smythe concluded that Oscar's condition was caused by his exposure to asbestos at the UCC plant. Dr. Smythe ruled out removing Oscar's tumor after discovering a heart arrhythmia. At the time of trial, Oscar planned to have chemotherapy treatment. Dr. Smythe stated that a person

---

[4] As described by one witness, "A gasket basically sits between two mating surfaces [connecting sections of pipe] and . . . serves to seal the joint."

[5] While the record reflects that Oscar's primary exposure was to "Kaylo" insulation and Garlock gaskets, there is also evidence that Oscar may have had varying levels of exposure at the plant to other brands of asbestos insulation as well as fireproofing products which contained asbestos.

3

Oscar's age has a fifty percent chance of completing a full course of chemotherapy, and only half of those who complete the treatment respond positively. Those that do will have their life extended by an average of three months. According to Dr. Smythe, Oscar would eventually die from the condition.

**B.     Asbestos Exposure**

Oscar testified that he worked as a pipefitter at UCC's Brownsville plant between 1975 and 1977. He was employed by Brown & Root (B&R), an independent contractor hired by UCC to perform maintenance and repair at the plant. Oscar routinely assembled, disassembled, fabricated, removed, and installed pipes at the plant. Oscar was exposed to asbestos from insulation and gaskets from this work. Oscar described working as a welder and a pipefitter at other locations, but he maintained that this other work did not expose him to asbestos products.

**1.     Insulation Exposure**

UCC stopped purchasing and installing new asbestos insulation in 1972, but asbestos insulation remained throughout its Brownsville plant during Oscar's employment as a pipefitter. Oscar described working almost every day in the vicinity of "insulators" i.e., workers who removed and installed insulation that covered the pipes. Oscar estimated he was within twenty feet of insulators as they worked, and he recalled that insulators would often work on scaffolding above him. He described insulators cutting insulation with a saw, which created a lot of dust. Oscar often removed insulation himself

4

before repairing a pipe.[6]   This created visible dust, which Oscar breathed.   Sometimes, his clothes were covered in insulation dust.

According to other employees who worked at the Brownsville plant with Oscar, pipefitters often removed old insulation when repairing a pipe.   Ruben Ruiz, a welder, stated that pipefitters used saws to cut into insulation, which released a cloud of dust. The insulation dust covered the clothes of workers.   Jesus Valenzuela, another welder, testified that he and Oscar worked within two to three feet of insulators.   He described insulators cutting insulation and breaking it into pieces resulting in visible dust, which he breathed.   Valenzuela also described working underneath insulators who were on scaffolding, which resulted in dust falling on the workers below.   Ruben Rodriguez, a pipefitter, stated that all the pipefitters cut pipe insulation using a chisel and hammer.

Gran Townsend, an industrial hygienist, was employed by UCC at its Brownsville plant during Oscar's tenure.   Townsend testified that when UCC bought the plant in 1958, all the insulation contained asbestos.   He recalled that pipefitters would remove old insulation prior to repairing a pipe.   Townsend authored a November 2, 1982 internal memo which acknowledged the continued existence of asbestos insulation throughout the Brownsville plant.

Kerry Weikel, a UCC maintenance systems technician, worked at the Brownsville plant with Oscar.   Weikel stated that UCC often scheduled insulators to work above other workers, including pipefitters, which resulted in dust falling on the workers below.

---

[6] Oscar later testified that he did not remove any pipe insulation himself.   However, we must assume that the jury resolved the conflicting testimony in favor of its verdict.   *See City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005).

## 2. Gaskets

Oscar testified that he removed Garlock 7705 gaskets from the flanges connecting pipes in the plant's acid unit two to three days a week. The gaskets contained 85 to 86 percent crocidolite asbestos. Oscar used a metal spatula and a wire brush to break apart and remove the old gaskets. If the gasket could not be removed easily, Oscar would have to scrub the gasket with a wire brush for anywhere from five to twenty minutes. He was necessarily within arm's length of the gaskets during removal. This process created visible dust that Oscar inhaled. Rodriguez and another coworker, Francisco Robledo, described a similar process for removing gaskets. Townsend testified that UCC used and installed gaskets made of asbestos during Oscar's time at the plant.

Weikel testified that crocidolite gaskets manufactured by Garlock were used in the plant's acid unit between 1975 and 1977. Weikel observed pipefitters removing gaskets using a wire brush. During turnarounds, pipefitters sometimes used a power brush. Weikel stated that the removal of gaskets created visible dust.

## B. Expert Testimony—Causation

Samuel Hammar, M.D., a clinical pathologist focusing on pulmonary pathology, testified that there are two families of asbestos fibers: (1) the serpentine family which includes chrysotile or white asbestos; and (2) the amphibole family, which includes two asbestos types used commercially—amosite and crocidolite. Dr. Hammar explained that most thermal insulation was composed of a combination of amosite and chrysotile fibers. Some gaskets were made with pure chrysotile fibers, while others contained predominantly crocidolite fibers. According to Dr. Hammar, all forms of asbestos cause

6

cancer, but crocidolite is the most carcinogenic on a fiber-per-fiber basis. According to a peer-reviewed study, "crocidolite is five times more potent than amosite and 500 times more potent than chrysotile."

Dr. Hammar explained that there is no level of exposure where asbestos does not present a risk of causing cancer. The permissible exposure limit (PEL) set by the Occupational Safety and Health Administration (OSHA) is .1 fiber particles per cubic centimeter of air as an eight-hour time-weighted average, which is seventy times the background concentration of asbestos. OSHA developed the PEL based on epidemiological studies of those with high exposure. According to those studies, at least seven out of 100,000 people whose exposure was within the PEL developed mesothelioma. Based on his review of Oscar's work history, Dr. Hammar concluded that Oscar's condition was caused by his exposure to asbestos—from both insulation and gaskets—while working as a pipefitter at UCC's plant. Dr. Hammar did not believe that Oscar had any significant occupational exposure to asbestos other than his time working at the UCC plant.

Ronald Gordan, Ph.D., a pathologist specializing in electron microscopy, performed an asbestos fiber burden test on a sample of Oscar's lung tissue. Dr. Gordan found roughly equal amounts of crocidolite and amosite asbestos fibers in the sample. Dr. Gordan stated that these types of asbestos fibers are found only in the lungs of persons who have been exposed to asbestos occupationally.

Richard Lemen, Ph.D., an epidemiologist,[7] testified that researchers have been unable to identify a safe concentration of asbestos below which people would not be at risk of developing asbestos-related cancer. Rather, he explained that any level of exposure to asbestos can potentially contribute to the development of mesothelioma. Dr. Lemen stated that crocidolite is the most potent type of asbestos for causing mesothelioma.

Dr. Lemen believed that Oscar was likely exposed to Kaylo brand insulation, which was composed of twelve to eighteen percent asbestos. He noted that studies have shown that visible dust from asbestos insulation exposes a worker to asbestos at a level that is 100 times the PEL set by OSHA. He agreed that Oscar was exposed to 100 times the PEL based on Oscar's representation that he saw visible dust from insulation.

William Longo, PhD, a material scientist, conducted simulations to determine the release of fibers during the removal of gaskets containing encapsulated asbestos fibers. Dr. Longo explained that he used "Tyndall lighting," which is a technique employing the use of high intensity light to make microscopic particles visible. In his studies, Dr. Longo used a wire brush to scrape the gaskets, which he determined released between 1.5 and 10 asbestos fibers per cubic centimeter, with an average release of 3.7 fibers per cubic centimeter.

---

[7] Dr. Lemen explained that epidemiology is a field of medicine that studies certain populations to determine what causes various diseases. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 715 (Tex. 1997) ("Epidemiological studies examine existing populations to attempt to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition.").

Donna Ringo, a certified industrial hygienist, testified on behalf of Garlock. It was her opinion that Oscar's removal of gaskets did not increase his risk of developing mesothelioma. Ringo based her opinion on air monitoring surveys of workers removing gaskets from steam lines or gas lines. According to Ringo, the surveys indicated that the workers were exposed to asbestos at a level that was less than or equal to the PEL. However, the surveys only involved chrysotile gaskets, not crocidolite gaskets.

Ringo believed that Oscar's only significant exposure to asbestos was from thermal insulation. She explained that "insulation work would be hundreds if not thousands of times higher in exposure" than gasket work. Ringo stated that four to five fiber years [8] is the lowest cumulative dose documented for the development of mesothelioma. This threshold dose was developed from a study which calculated cumulative doses of "cohorts of people who were getting sick." Ringo testified that Oscar's exposure was at least at the level of those in the study.

John Craighead, M.D., an anatomic and clinical pathologist, also testified for Garlock. Dr. Craighead opined that Oscar's mesothelioma was caused by amosite-containing thermal insulation. He stated that there is a body of epidemiological literature on insulation exposure similar to Oscar's exposure. Dr. Craighead explained that these studies establish that persons who remove asbestos insulation from pipes are at a high risk of developing mesothelioma. And he agreed that the level of amosite in Oscar's lungs indicated that his exposure to asbestos was above background levels. Dr. Craighead did not believe that gaskets were a risk factor for mesothelioma because they

[8] Ringo expressed the dose level as "fiber years" which measures cumulative exposure of fibers per cubic centimeter over a number of years.

9

contained nonfriable [9] asbestos.   He disagreed with Dr. Gordan's conclusion that Oscar's lung tissue sample contained crocidolite fibers.

Fred Boelter, a certified industrial hygienist, conducted studies to determine the release of asbestos fibers from removing gaskets.   According to his studies, the average fiber release generated from gasket removal was .026 fibers per cubic centimeter, which is below OSHA's PEL.

Eric Chatfield, Ph.D., a microscopist, disagreed with Dr. Gordan's conclusion that there was a crocidolite fiber in Oscar's lung sample.   It was his opinion that the fibers were all amosite.

## C.    Knowledge of Risk and Failure to Warn

Dr. Lemen testified that both UCC and Garlock would have been aware, during the period of Oscar's exposure at the plant, that any exposure to asbestos puts a person at risk of developing cancer.   However, he noted that it was not until the 1990s that the scientific community began to recognize that encapsulated asbestos contained in gaskets was harmful to workers.   Nevertheless, Dr. Lemen believed that a reasonable company would have applied warnings to products containing primarily crocidolite asbestos, such as the Garlock 7705 gaskets.   Referencing a 1968 UCC internal memo, Dr. Lemen stated that UCC was aware of the causal relationship between crocidolite and mesothelioma.

James Heffron, Garlock's corporate representative, testified that Garlock did not provide warnings or instructions for the safe use of its 7705 gasket prior to 1980, except

---

[9] As explained by other witnesses, friable asbestos products are those which are easily crumbled and, therefore, more susceptible to releasing asbestos fibers when handled.

10

for a standard OSHA warning.   Heffron stated that, prior to 1980, Garlock did not conduct any tests of its gaskets to determine if the removal process exposed a person to respirable asbestos fibers.   Weikel testified that there were no warnings for the Garlock gaskets.

Townsend testified that UCC was aware that asbestos could cause mesothelioma prior to Oscar's time at the Brownsville plant.   He stated that there were no labels on the installed insulation indicating whether it contained asbestos.   Weikel testified that UCC did not put up warning signs when workers removed insulation during shutdowns or turnarounds.   From 1975 to 1977, Townsend did not worry about asbestos exposure from gaskets because he believed gaskets were incapable of releasing asbestos fibers. However, Townsend acknowledged that applying friction to an asbestos product would potentially generate respirable asbestos.   Weikel was also aware that the removal of gaskets created visible dust.

Oscar testified that UCC did not warn him about the hazards of asbestos.   He also stated that the gaskets themselves were not affixed with a warning.   No one instructed Oscar on how to control dust generated from gasket removal.   When insulators were working nearby, Oscar stated that there were no warnings posted and UCC did not instruct him to wear a respirator.   He recalled that paper masks were available, but they were not required.   Oscar stated that the paper masks were not useful because they would "clog."   Oscar's co-workers Agustin Cruz, Ruiz, Valenzuela, and Rodriguez all testified that UCC did not warn them that asbestos was dangerous.

## D.    Control

Several witnesses who worked at the plant during the relevant time period testified regarding UCC's supervision of B&R employees.   According to Townsend, B&R did not employ its own industrial hygienist; therefore, UCC's hygienist oversaw and monitored the work of B&R employees.   UCC regulated the safety of all workers at the plant.   UCC required B&R pipefitters to use materials, supplies, and tools that UCC provided.   UCC was responsible for telling B&R workers what work to do and when they were to do it.   According to Weikel, UCC employed maintenance area coordinators or operators who were responsible for advising B&R maintenance workers regarding the procedures to use for various repairs.   Operators informed a B&R foreman when they saw a B&R employee doing a repair incorrectly—such as when a pipefitter was tightening or bolting flanges incorrectly or using the wrong gasket.   B&R pipefitters could not begin working on a job until a UCC safety inspector gave permission.   When work was completed, a UCC employee would inspect the work prior to approving the job.

Weikel testified that B&R pipefitters were not free to do repair work their own way if it differed from UCC's preferred method.   Weikel agreed with the assertion by the Torreses' counsel that B&R foremen were essentially "puppets" of UCC.   Ruiz testified that UCC operators were always close by supervising B&R workers.   Cruz stated that UCC operators would tell B&R employees "the procedures to use on different repairs."

## E.    Jury Verdict

The jury returned a verdict in favor of the Torreses, allocating responsibility as follows:   Garlock 45%, UCC 45%, and B&R 10%.   The jury awarded $1,500,000 for

12

future physical pain and mental anguish and future medical expenses, and $1,500,000 to Dora Torres for future loss of consortium. The trial court reduced the award for the responsibility allocated to non-party B&R and entered judgment accordingly. This appeal followed.

## II.     STANDARD OF REVIEW

We will sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following:   (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). Evidence does not exceed a scintilla if it is so weak as to do no more than to create a mere surmise or suspicion that the fact exists. *Id*.

It is the province of the jury to resolve conflicts in the evidence. *City of Keller*, 168 S.W.3d at 820. Accordingly, we must assume that the jury resolved all conflicts in accordance with its verdict. *Id*. In conducting a legal sufficiency review, a court must consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id*. at 822. If the evidence allows only one inference, neither jurors nor the reviewing court may disregard it. *Id*. However, if the evidence at trial would enable reasonable and fair-minded people to differ in their

13

conclusions, then jurors must be allowed to do so. *Id.* A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement. *Id.*

### III. CHAPTER 95

By its first two issues, UCC argues that there is legally insufficient evidence establishing its liability as a premises owner under Chapter 95 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. ch. 95.

### A. Applicable Law

Chapter 95 of the Texas Civil Practice and Remedies Code is titled "Property Owner's Liability for Acts of Independent Contractors and Amount of Recovery." *Id.* Sections 95.002 and .003 establish limitations on a property owner's liability for personal injury, death, or property damage to independent contractors. *See id.* §§ 95.002, .003; *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 46 (Tex. 2015). Section 95.003, entitled "Liability for Acts of Independent Contractors," provides:

> A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless:
>
> (1)  the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and
>
> (2)  the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.003.

14

Chapter 95 applies "to all negligence claims that arise from either a premises defect or the negligent activity of a property owner or its employees." *Abutahoun*, 463 S.W.3d at 50. However, it applies only when the injury results from a condition or use of the same improvement that the contractor is constructing, repairing, renovating, or modifying. *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 567 (Tex. 2016). The property owner has the burden to establish that Chapter 95 applies to the plaintiff's claim. *See Rueda v. Paschal*, 178 S.W.3d 107, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Once the defendant has shown that Chapter 95 applies, the plaintiff has the burden to establish both prongs of § 95.003. *Id*.

## B. Control

In its first issue, UCC challenges the legal sufficiency of the evidence supporting the jury's findings that UCC "exercise[d] or retain[ed] some control over the manner in which [Oscar's] pipefitting work at [UCC's] premises was performed, other than the right to order the work to start or stop or to inspect progress or receive reports." UCC argues that B&R, an independent contractor, was Oscar's employer and controlled the details of his work. Therefore, UCC contends that it cannot be held liable as a premises owner under Chapter 95. Oscar responds that the evidence establishes that UCC controlled the manner in which B&R maintenance workers, including Oscar, performed their work.

The type of control contemplated by § 95.003(1) refers to a property owner's right to control the means, methods, or details of the manner in which the work is performed to the extent that those doing the work are not entirely free to do the work in their own way. *See Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791–92 (Tex. 2006); *Elliott-*

15

*Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999); *Torres v. Chauncey Mansell & Mueller Supply Co.*, 518 S.W.3d 481, 492 (Tex. App.—Amarillo 2017, pet. denied). A right of control must extend to the operative detail of the contractor's work. *Chi Energy, Inc. v. Urias*, 156 S.W.3d 873, 880 (Tex. App.—El Paso 2005, pet. denied). It is not enough that the owner has the right to order the work to stop and start, to inspect progress, or to receive reports, or that the owner recommends a safe manner for the independent contractor's employees to perform the work. *See Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606–09 (Tex. 2002).

UCC relies primarily on evidence that Oscar and other B&R workers received their instructions from a B&R foreman. However, this fact alone is not dispositive. A defendant may retain control over the work even if the defendant is not present, supervising, or directing the work at the time of the injury. *Hernandez v. Amistad Ready Mix, Inc.*, 513 S.W.3d 773, 776 (Tex. App.—San Antonio 2017, no pet.); *see Lee Lewis Constr. v. Harrison*, 70 S.W.3d 778, 782, 784 (Tex. 2001); *Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469, 469 (Tex. 1985) (per curiam). Furthermore, if the defendant retains some control over the operative detail of the work, the defendant is not excused from liability merely because others also retained some control over the work or some responsibility for workplace safety. *Hernandez*, 513 S.W.3d at 776; *see Lee Lewis Const.*, 70 S.W.3d at 782, 784; *Tovar*, 692 S.W.2d at 469. According to several witnesses, UCC operators instructed B&R foremen how B&R employees were to perform their work. In that regard, B&R foremen were considered "puppets" of UCC. And UCC's instructions were not limited to ordering work to stop and start and recommending a safe manner to perform

16

the work. Rather, UCC instructed B&R pipefitters how to do repairs—including how to tighten a bolt on a flange and which gasket to use. Further, UCC operators were always present during repairs, and they inspected the work when it was finished to determine if it was satisfactory. If it was not, the operators instructed B&R workers to correct it. UCC required B&R workers to use only the tools and supplies that UCC provided. UCC also controlled the sequence and timing of maintenance work such that it controlled the proximity of the workers to each other. This resulted in Oscar working underneath insulators which further exposed him to insulation dust.

We conclude that there is more than a scintilla of evidence supporting the jury's finding that UCC exercised some control over the means, methods, and details of Oscar's work. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(1); *Ramirez*, 196 S.W.3d 788, 791–92; *Ridgway*, 135 S.W.3d at 601. We overrule UCC's first issue.

## C.     Actual Knowledge

By its second issue, UCC argues there is legally insufficient evidence that it had actual knowledge that the Garlock gaskets were dangerous. Question 4 of the jury charge reads in pertinent part as follows:

Did the negligence, if any, of [UCC] proximately cause [Oscar's] asbestos-related injury?

With respect to the condition of the premises, [UCC] was negligent if:

1.   the condition posed an unreasonable risk of harm, and

2.   *[UCC] had actual knowledge of the danger*, and

3.   [UCC] failed to exercise ordinary care to protect [Oscar] from the danger by both failing to adequately warn [Oscar] of the condition and failing to make the condition reasonably safe.

17

(emphasis added). The jury was not asked specifically whether UCC had actual knowledge that the Garlock gaskets were dangerous, and UCC did not object to question 4 on this basis.[10] In the context of a jury trial, the sufficiency of the evidence is reviewed in the light of the charge submitted if no objection is made to the charge. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001). With respect to the negligence question, the jury was asked only whether UCC had actual knowledge of the "danger." In that regard, the jury was not limited solely to considering whether UCC had actual knowledge that the Garlock gaskets were dangerous. Rather, even if there was insufficient evidence to show UCC had actual knowledge that the Garlock gaskets were dangerous, the jury's affirmative answer to Question 4 could still have been based on UCC's actual knowledge of the danger resulting from insulation removal. UCC concedes its actual knowledge of the broader danger posed by asbestos in its brief when its states: "UCC does not dispute that it had learned airborne respirable asbestos was a health risk by the time [Oscar] worked at the Brownsville plant." By restricting its argument to whether it had actual knowledge that the Garlock gaskets were dangerous, as opposed to other sources of asbestos at its plant, UCC has failed to demonstrate reversible error. *See* TEX. R. APP. P. 44.1(a).

At any rate, even had the more specific question been posed to the jury, we conclude that there is legally sufficient evidence that UCC had actual knowledge that the

---

[10] Specifically, UCC did not object that the instruction should be phrased more narrowly to focus solely on its actual knowledge of the danger posed by Garlock gaskets. Neither did UCC propose its own instruction containing such language.

Garlock gaskets were dangerous. Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge, which can be established by facts or inferences that a dangerous condition could develop over time. *Ineos*, 505 S.W.3d at 568; *City of Corsicana v. Stewart*, 249 S.W.3d 412, 414–15 (Tex. 2008) (per curiam). Circumstantial evidence establishes actual knowledge only when it either directly or by reasonable inference supports that conclusion. *Ineos*, 505 S.W.3d at 568; *State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002).

Here, the record reflects that the Garlock gaskets were composed primarily of crocidolite asbestos, which was widely known in the industry at the time to be the most carcinogenic type of asbestos fiber. As early as 1968, UCC was aware of the causal relationship between crocidolite and mesothelioma. While there was evidence that scientists did not believe encapsulated asbestos products posed a danger until after Oscar's tenure, UCC's industrial hygienist at the time acknowledged that applying friction to an encapsulated asbestos product—as Oscar did to the gaskets—could generate respirable fibers. In addition, UCC's maintenance system's technician knew that the removal of gaskets created visible dust. We must presume that the factfinder reconciled this conflicting evidence in favor of its verdict. *See City of Keller*, 168 S.W.3d at 820.

We conclude that there is more than a scintilla of evidence that UCC had actual knowledge that the Garlock gaskets were dangerous at the time Oscar was exposed to them. *See Ridgway*, 135 S.W.3d at 601. For the foregoing reasons, we overrule UCC's second issue.

19

## IV.     SUBSTANTIAL FACTOR CAUSATION

Both UCC and Garlock argue that there is legally insufficient evidence that Oscar's exposure to asbestos at the UCC plant or from the Garlock gaskets was a substantial factor in causing Oscar's mesothelioma.

### A.     Applicable Law

Causation in toxic tort cases is discussed in terms of general and specific causation.  *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury.  *Id*.  "Substantial factor" is a term used to describe the level of proof required to establish specific causation in cases where the plaintiff is exposed to multiple sources of the same toxin.  *Bostic v. Georgia-Pac. Corp*., 439 S.W.3d 332, 352 (Tex. 2014).  Appellants do not dispute general causation.  That is, they do not dispute that asbestos is capable of causing mesothelioma.   However, each appellant argues that Oscar failed to establish that his relative exposure to asbestos from their particular products or premises was a substantial factor in causing his mesothelioma.

The Texas Supreme Court first adopted the substantial factor causation test in *Borg-Warner Corp. v. Flores*.   232 S.W.3d 765 (Tex. 2007).   In *Flores*, the plaintiff was a mechanic who claimed to have developed asbestosis from his exposure to brake pads. *Id*. at 766.   The Court identified the following failures in the plaintiff's proof of causation:

> [W]hile some respirable fibers may be released upon grinding some brake pads, the sparse record here contains no evidence of the approximate quantum of Borg–Warner fibers to which Flores was exposed, and whether this sufficiently contributed to the aggregate dose of asbestos Flores

20

inhaled, such that it could be considered a substantial factor in causing his asbestosis.

*Id*. at 772. The Court rejected as legally insufficient a theory of causation that "any exposure" to asbestos can cause asbestosis. *Id*. at 771. It noted that the most widely cited standard for proving causation in asbestos cases was the *Lohrmann* "frequency, regularity, and proximity" test from the United States Fourth Circuit Court of Appeals. *Id*. at 769 (citing *Lohrmann v. Pittsburgh Corning Corp*., 782 F.2d 1156 (4th Cir. 1986)). The Court agreed that such a test was appropriate, but it declined to adopt the test wholesale. *Id*. Rather, the Court explained that in cases of multiple exposures, "proof of mere frequency, regularity, and proximity is necessary but not sufficient[.]" *Id*. at 772. Emphasizing toxicology's central tenet that "the dose makes the poison," the Court provided the following guidance: "Thus, substantial-factor causation, which separates the speculative from the probable, need not be reduced to mathematical precision. Defendant-specific evidence relating to the approximate dose to which the plaintiff was exposed, coupled with evidence that the dose was a substantial factor in causing the asbestos-related disease, will suffice." *Id*. at 773.

Later, in *Bostic*, the Court extended the substantial factor causation test to all asbestos-related diseases, including mesothelioma, while also incorporating a "doubling of the risk" requirement:

> [I]n the absence of direct proof of causation, establishing causation in fact against a defendant in an asbestos-related disease case requires scientifically reliable proof that the plaintiff's exposure to the defendant's product more than doubled his risk of contracting the disease. A more than doubling of the risk must be shown through reliable expert testimony that is based on epidemiological studies or similarly reliable scientific testimony.

21

*Bostic*, 439 S.W.3d at 350. The Court reiterated that "proof of 'any exposure' to a defendant's product will not suffice and instead the plaintiff must establish the dose of asbestos fibers to which he was exposed by his exposure to the defendant's product[.]" *Id*. at 353. "[T]he defendant's product is not a substantial factor in causing the plaintiff's disease if, in light of the evidence of the plaintiff's total exposure to asbestos or other toxins, reasonable persons would not regard the defendant's product as a cause of the disease[.]" *Id*. The Court concluded that the causation evidence was legally insufficient because the plaintiffs failed to establish even an approximate dose to which Bostic was exposed. *Id*. at 355.

**B.    UCC**

In its third issue, UCC argues that the Torreses failed to establish by legally sufficient evidence that Oscar's exposure to asbestos at its Brownsville plant was a substantial factor in causing his mesothelioma. UCC maintains that the Torreses failed to quantify Oscar's exposure to asbestos from both gaskets and insulation. UCC further maintains that the Torreses' expert witnesses relied on the "any exposure" theory rejected by *Flores* and *Bostic*.

We first note that UCC is a premises liability defendant, where *Flores* and *Bostic* involved product liability defendants. The substantial factor causation test announced in *Flores* and *Bostic* applies to cases where a products liability defendant is one of many whose products contributed to a plaintiff's exposure. For instance, Flores was exposed to several brands of brake pads, and Bostic was exposed to multiple brands of drywall joint compound. *Bostic*, 439 S.W.3d at 353; *Flores*, 232 S.W.3d at 766. Here, the

22

evidence establishes that Oscar's only significant exposure to asbestos—whether originating in gaskets or insulation—occurred at UCC's Brownsville plant. There is no evidence that Oscar suffered occupational exposure to asbestos at any other location. As it concerns UCC, this is not a multiple exposure case. Thus, the Torreses did not need to quantify the exposure to gasket-originated asbestos separately from insulation-originated asbestos.

In *Bostic*, the Court acknowledged the possibility that a plaintiff can establish direct proof of causation with reliable expert testimony that the plaintiff's exposure to a particular toxin is the only possible cause of his disease and the only possible source of the toxin is the defendant's product. *Bostic*, 439 S.W.3d at 352. We believe this observation holds equally true for a premises liability defendant. Here, UCC does not dispute that asbestos exposure is the only possible cause of Oscar's mesothelioma. And the evidence established that the only possible source of Oscar's exposure was UCC's Brownsville plant. *See City of Keller*, 168 S.W.3d at 822.

We further note that the evidence satisfies both *Lohrmann*'s "frequency, regularity, and proximity" test as well as *Flores* and *Bostic*'s emphasis on dose. *See id*. at 352 (explaining that "even in the single-exposure case, proof of dose would be required" to establish specific causation). Oscar described working within twenty feet of insulators every day for a period of three years. During this same period, he recalled working two to three days a week in the plant's acid unit removing pipe insulation and Garlock gaskets. At times, it would take Oscar up to twenty minutes of scrubbing with a wire brush to remove a gasket. This work placed him within arm's length of respirable asbestos fibers.

23

Thus, the Torreses presented evidence of frequent, regular, and proximate exposure to asbestos. *See Flores*, 232 S.W.3d at 772 (stating that Flores "seemingly" satisfied *Lohrmann*'s frequency-regularity-proximity test where the evidence showed that "Flores worked in a small room, grinding brake pads composed partially of embedded asbestos fibers, five to seven times per week over a four year period").

With respect to dose, Dr. Hammar testified that the PEL established by OSHA was based on epidemiological studies of those occupationally exposed to asbestos. At the PEL of .1 fibers per cubic centimeter, 7 out of 100,000 people developed mesothelioma. Dr. Lemen testified that by breathing in visible dust from asbestos insulation, Oscar was exposed at a level 100 times the PEL. According to Dr. Longo's studies, workers who removed asbestos gaskets were exposed on average to 3.7 fibers per cubic centimeter, which is 37 times the PEL.[11] According to Dr. Gordan, a biopsy of Oscar's lung tissue confirmed the presence of both crocidolite and amosite asbestos fibers at a level only seen in those with occupational exposure. This evidence establishes that Oscar's exposure greatly exceeded a threshold dose developed from epidemiological studies. The record further establishes that Oscar's only significant occupational exposure occurred at UCC's Brownsville plant. We conclude that this evidence is legally sufficient to establish specific causation—that Oscar's exposure to asbestos at UCC's Brownsville plant caused his mesothelioma. *See Havner*, 953 S.W.2d at 714.

For the foregoing reasons, we overrule UCC's third issue.

---

[11] Garlock's expert Ringo cited studies which indicated that 4 to 5 fiber years was the lowest cumulative dose documented for the development of mesothelioma, and she testified that Oscar's exposure was at least at the level of those in the study.

C.      **Garlock**

In its sole issue, Garlock argues that the Torreses failed to demonstrate that Oscar's exposure to its gaskets in particular was a substantial factor in causing his mesothelioma. Garlock argues that the Torreses failed to present evidence establishing Oscar's aggregate dose of asbestos exposure, the dose attributable to its product, or that such a dose more than doubled Oscar's risk of developing mesothelioma. The Torreses respond that the evidence establishes the dose to which Oscar was exposed and that the crocidolite fibers found in his lungs could have only come from the Garlock gaskets.

In our consideration of UCC's causation issue, we attributed evidence of Oscar's asbestos exposure solely to UCC because the record established that Oscar's only significant exposure was at UCC's Brownsville plant. However, Garlock is a products liability defendant, and its gasket was one of many asbestos products which Oscar was exposed to at the Brownsville plant. *See supra* note 5. Therefore, with respect to their claims against Garlock, the Torreses were required to meet the substantial factor causation test for multiple exposure cases as announced in *Flores* and *Bostic*.

In *Flores*, the Court found the evidence of causation legally insufficient because the plaintiff failed to establish his aggregate dose and failed to "introduce evidence regarding what percentage of that indeterminate amount may have originated with Borg-Warner's products" as opposed to "other brands of brake pads." 232 S.W.3d at 772. Similarly, in *Bostic*, the Court noted that the plaintiffs failed to quantify the aggregate dose, failed to quantify the dose attributable to Georgia-Pacific, and failed to show that the dose

25

attributable to Georgia-Pacific more than doubled Bostic's chances of developing mesothelioma.   439 S.W.3d at 360.

As stated above, the Torreses presented evidence of Oscar's average exposure to asbestos fibers when removing gaskets paired with frequency-regularity-proximity evidence.   While this evidence arguably demonstrates a dose attributable solely to Garlock gaskets, there is no evidence showing that such a dose more than doubled Oscar's risk of developing mesothelioma.   *Bostic* requires that more than doubling of the risk "be shown through reliable expert testimony that is based on epidemiological studies or similarly reliable scientific testimony."   *Id*. at 350.

> The plaintiff "must show that he or she is similar to those in the studies. This would include proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies . . . and that the timing of the onset of injury was consistent with that experienced by those in the study."

*Id*. at 359 (quoting *Havner*, 953 S.W.2d at 720).   "Without such a showing, 'epidemiological studies are without evidentiary significance.'"   *Id*. (quoting *Flores*, 232 S.W.3d at 771).

The Torreses' failure to produce such evidence may be due to Dr. Lemen's acknowledgment that there existed no studies at the time examining the risk of developing mesothelioma from working with gaskets.   In 1998, the Texas Supreme Court declared that asbestos litigation had reached its maturity.   *See In re Ethyl Corp.*, 975 S.W.2d 606, 610 (Tex. 1998).   But the record in this case reflects that the scientific community has only recently appreciated the risk posed by encapsulated asbestos products such as the Garlock gasket.   Without the benefit of epidemiological studies, the Torreses relied on

26

Dr. Longo's Tyndall lighting study quantifying the release of asbestos fibers from gaskets during the removal process. In *Bostic*, the Court concluded that a similar study by Dr. Longo was insufficient to establish substantial factor causation in a multiple-exposure case. *See Bostic*, 439 S.W.3d at 355 (concluding that Dr. Longo's study of concentrations of asbestos released by workers performing drywall work was legally insufficient to establish causation). The Torreses have failed to demonstrate through epidemiological studies or similarly reliable scientific testimony a dose attributable to the Garlock gaskets that more than doubled Oscar's risk of developing mesothelioma. *See id.* at 350. Under Texas's established precedent for multiple exposure cases, we are constrained to conclude that the evidence is legally insufficient to establish that Oscar's exposure to the Garlock gaskets was a substantial factor in causing his condition.

We sustain Garlock's sole issue.

## V.   CONCLUSION

We reverse the portion of the judgment against Garlock and render judgment that the Torreses take nothing on their claims against Garlock. We affirm the remainder of the judgment.


LETICIA HINOJOSA
Justice

Delivered and filed the
19th day of December, 2019.

27